Filed 11/14/13  P. v. Neal CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F065983 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. F11905543) |
| BYRON LEE NEAL, | **OPINION** |
| Defendant and Appellant. | |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Fresno County.  Don Penner, Judge.

Elizabeth Campbell, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Raymond L. Brosterhous II, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Kane, Acting P.J., Franson, J. and Oakley, J.[†]

[†]     Judge of the Madera Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

After his suppression motion was denied, defendant Byron Lee Neal pled no contest to two counts of second degree robbery and admitted one firearm enhancement. On appeal, he contends the trial court erred in denying the motion to suppress. We will affirm.

## BACKGROUND

Defendant and another male were involved in crimes against two people who drove into a fast food restaurant parking lot. Defendant was later arrested on another matter. He was searched and found to be carrying a cell phone stolen during the prior crimes. The cell phone contained pictures of defendant. When confronted with the evidence, defendant admitted participating in the crimes. The victims also identified him as one of the perpetrators.

Defendant was charged with two counts of robbery (Pen. Code, § 211),[1] two counts of criminal threats (§ 422), and two counts of assault with a semiautomatic firearm (§ 245, subd. (b)). The robbery charges were accompanied by allegations that defendant personally used a firearm (§ 12022.53, subd. (b)) and was personally armed with a firearm (§ 12022, subd. (a)(1)). Connected to the assault charges were allegations that defendant personally used a firearm (§ 12022.5, subd. (a)).

Defendant pled not guilty. He twice moved to suppress the evidence, and both motions were denied. Defendant changed his plea and pursuant to a negotiated plea bargain was convicted of the two robbery counts and one firearm allegation (§ 12022.53, subd. (b)). The remaining counts were dismissed.

---

[1]     All statutory references are to the Penal Code unless otherwise noted.

2.

The trial court sentenced defendant to prison for 12 years, as follows: a two-year term for one robbery, a concurrent two-year term for the other robbery, plus a consecutive 10-year term for the firearm enhancement.[2]

## FACTS[3]

During the preliminary hearing, the parties stipulated for purposes of the preliminary hearing and the motion to suppress that a particular 911 dispatcher would testify, if called, that on September 23, 2011, at about 8:17 p.m., she received a call reporting an armed disturbance. "There was a black male adult with a gun. He went northbound on Fresno Street from White [Avenue] in all dark clothing. He was pointing a gun at a Hispanic male adult who left westbound on White [Avenue] …." This information was then dispatched to officers.[4]

Officers Beckford and McCray were dispatched to the brandishing. According to Officer Beckford, the reporting party explained that "the subjects had left walking northbound on Fresno [Street] from White [Avenue]." "The [dispatch] call had said suspects. [The officers] weren't given an exact number that [Officer Beckford] recall[ed]." As the officers patrolled the area, they saw three males walking under a freeway overpass. One of the males fit the description of the brandishing suspect provided by the reporting party. Defendant was one of the other two males.

The officers turned on the patrol car's overhead lights and spotlights, exited the car, and ordered the three males to stop. The suspect looked over his shoulder at the

---

[2]     Defendant notes that the abstract of judgment confuses the sentences for counts 1 and 2 (as does the minute order). We will direct the superior court to correct the abstract to conform with the trial court's oral pronouncement of judgment.

[3]     The facts are taken from the preliminary hearing.

[4]     The prosecutor agreed with the court that "this [was] for the purpose of some type of *Harvey*[-]*Madden* objection or foundation." (Italics added.) (See *People v. Harvey* (1958) 156 Cal.App.2d 516; *People v. Madden* (1970) 2 Cal.3d 1017.)

patrol car and immediately started running into an adjacent field. Defendant and the other male took off running in the other direction into the roadway. Officer McCray took off after the first male, and Officer Beckford told defendant and the other male to stop. In a few seconds, two or three shots were fired from the direction of the suspect and Officer McCray. Defendant and the other male, who had run eight or 10 feet, stopped running, looked toward the field, and went down to the ground with their hands under their bodies. Officer Beckford ordered them to put their hands out to the sides because she did not know if they also had weapons. They complied. One of them yelled that "they didn't have anything to do with it." Assisting officers arrived and handcuffed defendant and the other male, helped them up, and walked them to patrol vehicles.

As far as Officer Beckford knew, defendant was not under arrest at this point, but she had no further contact with him after he was handcuffed because she and her partner were taken to the staging area. About 20 minutes after defendant was taken into custody, Sergeant Chamalbide arrived on the scene.

On cross-examination, Officer Beckford said she did not see defendant with a weapon and she did not place him under arrest. She did see another officer arrest him, but she was not sure which officer it was. She did not see whether defendant and the other male were searched because she was no longer present.

Sergeant Chamalbide, the supervisor on duty, responded to the call that a suspect had fired shots at an officer. When Sergeant Chamalbide arrived on the scene, defendant was handcuffed and seated in the back seat of a patrol car. According to Sergeant Chamalbide, defendant was under arrest at this point and was being investigated for both the brandishing and the shooting. Sergeant Chamalbide believed defendant might have been involved in the shooting because the three males were together when the officers contacted them. Sergeant Chamalbide asked defendant to identify the suspect who had run into the field and shot at the officers, but defendant would not speak.

4.

The suspect who shot at the officers was still at large and tactical teams were conducting a yard-to-yard search for him. Sergeant Chamalbide was within the search area and was trying to protect himself as he spoke to defendant. He decided to call for a wagon to transport defendant to headquarters, where he could be interviewed for further details. Sergeant Chamalbide wanted to find out who the shooter was and where he might have gone, and he wanted to investigate the brandishing.

Before defendant was put in the wagon, an officer searched him. Defendant had two cell phones on his person. The items were put in a property bag and taken with him to headquarters. The search was for the purpose of taking everything off defendant's person before he was transported; it was not a search for weapons.

Sergeant Chamalbide wanted to search ("dump") the contents of defendant's cell phones to determine if defendant had talked to the shooter, and possibly to triangulate the shooter's location. Sergeant Chamalbide ordered a detective to search the cell phone's contents. After the detective did so, he informed Sergeant Chamalbide that the cell phone had been stolen during a carjacking (the prior crimes) and that it contained several pictures of defendant. Sergeant Chamalbide contacted the detective who was investigating the prior crimes.

On cross-examination, Sergeant Chamalbide said he thought the initial dispatch had been about one suspect brandishing a weapon. He explained, "If I remember right, yes, it was one." He also stated that, at least until defendant arrived at headquarters, he had no information that defendant possessed a weapon and no one had identified him as being involved in the brandishing. Sergeant Chamalbide explained that it was police practice to remove all property from a person before placing him in the wagon for transport. Defendant was not given the option of leaving; he was under arrest at that point.

On redirect examination, Sergeant Chamalbide explained that the routine search before transport was for the safety of both officers and suspects.

*Defense Evidence*

Sergeant Chamalbide was called by the defense.  He testified that about 30 or 60 minutes passed between his giving the cell phone to the detective and the detective's telling him the cell phone had been taken in the prior crimes.

On cross-examination, Sergeant Chamalbide explained he had told the prosecutor he wanted to further explain why defendant was placed under arrest.  Sergeant Chamalbide said that when he arrived on the scene, he received information from officers and he was investigating several aspects, including a violation of section 148 (resisting an officer in the lawful performance of his or her duties )[5]—"if they had run, if they had pushed the officers during the incident."  Sergeant Chamalbide was also investigating whether the two males were involved in a conspiracy in the shooting.  Based on his experience, Sergeant Chamalbide knew that gang members develop street credit by shooting at officers.  For this reason, he was also investigating a gang enhancement.

On redirect examination, Sergeant Chamalbide stated he did not arrest defendant for violating section 148.

## DISCUSSION

Defendant asserts that the officers did not have reasonable suspicion to detain him based on the brandishing report, and therefore the detention was unlawful and his resistance to it was not a violation of section 148.  Consequently, the officers lacked probable cause to arrest him.  He stresses we are bound by the parties' stipulation that the dispatcher stated that a single suspect was involved in the brandishing.

A detention occurs within the meaning of the Fourth Amendment when the officer, by means of physical force or show of authority, in some manner temporarily

---

[5]     Section 148, subdivision (a)(1) provides that "[e]very person who willfully resists, delays, or obstructs, any … peace officer … in the discharge or attempt to discharge any duty of his or her office or employment" violates the law and may be punished.

restrains the individual's liberty. (*People v. Zamudio* (2008) 43 Cal.4th 327, 341; *People v. Souza* (1994) 9 Cal.4th 224, 229 (*Souza*).) Although a police officer may approach an individual in a public place and ask questions if the person is willing to listen, the officer may detain the person only if the officer has a reasonable, articulable suspicion the detainee has been, currently is, or is about to be engaged in criminal activity. (*Terry v. Ohio* (1968) 392 U.S. 1, 21; see *In re Tony C.* (1978) 21 Cal.3d 888, 893.) To satisfy the requirement, the officer must "point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." (*Souza, supra,* at p. 231; *United States v. Sokolow* (1989) 490 U.S. 1, 7 ["the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause"].)

The inferences from conduct required to establish a reasonable suspicion ultimately rest on commonsense judgment about human behavior, rather than on scientific studies. (*Illinois v. Wardlow* (2000) 528 U.S. 119, 125.) "The possibility of an innocent explanation does not deprive the officer of the capacity to entertain a reasonable suspicion of criminal conduct. Indeed, the principal function of his investigation is to resolve that very ambiguity and establish whether the activity is in fact legal or illegal— to 'enable the police to quickly determine whether they should allow the suspect to go about his business or hold him to answer charges.' [Citation.]" (*In re Tony C., supra,* 21 Cal.3d at p. 894.) But, of course, "an investigative stop or detention predicated on mere curiosity, rumor, or hunch is unlawful, even though the officer may be acting in complete good faith. [Citation.]" (*Id.* at p. 893.)

Here, articulable facts supported the detention. Defendant was in the company of a suspect in a recent brandishing, and they were only a few blocks from where the crime had occurred. It was unlikely that defendant and the other male just happened to join up with the suspect in the previous minutes, unaware of the brandishing. Furthermore, it

was highly likely that the brandishing suspect was still armed, and very possible that defendant and the other male were also armed. In light of the totality of the circumstances, it was reasonable for the officers to suspect that defendant might be involved in criminal activity. Thus, it was reasonable for the officers to detain not only the suspect, but also defendant and the other male who were with the suspect.

Because defendant was lawfully detained, he had no right to resist the detention and flee when the officers ordered him to stop. Once defendant fled, the officers had probable cause to arrest him for resisting an officer in the lawful performance of his duties under section 148. (*People v. Allen* (1980) 109 Cal.App.3d 981, 985-987; *People v. Kraft* (2000) 23 Cal.4th 978, 1037 ["Probable cause to arrest exists if facts known to the arresting officer would lead a person of ordinary care and prudence to entertain an honest and strong suspicion that an individual is guilty of a crime."].) The facts provided probable cause to arrest him under section 148 even if the arresting officer in fact arrested him for another reason. (*Devenpeck v. Alford* (2004) 543 U.S. 146, 153 [arresting officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause"].) With probable cause to arrest, the officers were entitled to search defendant incident to the arrest. (*Virginia v. Moore* (2008) 553 U.S. 164, 177-178 [when officer has probable cause to arrest a person, a warrantless search is justified as a search incident to arrest]; *People v. Diaz* (2011) 51 Cal.4th 84, 90.)

The trial court did not err in denying defendant's motion to suppress.

## DISPOSITION

The judgment is affirmed. The clerk of the superior court is directed to correct the abstract of judgment to reflect that the sentence on count 1, not count 2, is the concurrent sentence.