Filed 8/28/23  P. v. Ortiz CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ANALIZ MARIE ORTIZ,<br><br>    Defendant and Appellant. | C095505<br><br>(Super. Ct. No. 19FE017974) |

Sacramento police officers approached a group of individuals in an area of Sacramento County known for criminal activity.  Defendant Analiz Ortiz was seated in the front passenger seat of a parked Honda Accord.  Joe Gallegos and two others were standing next to the Accord.

Gallegos told an officer that a Chevy Impala parked nearby belonged to him and that the Accord belonged to defendant.  Because Gallegos was on searchable probation, the officers searched his Impala.  In that search, officers found indicia of drug sales and property belonging to defendant.  The officers separately learned that Gallegos had been driving the Accord two months prior when he was arrested for selling drugs.  The officers searched the Accord and found controlled substances and firearms.

1

The People charged defendant and Gallegos with various crimes. After the trial court denied her motion to suppress evidence, defendant pleaded no contest to possession of a controlled substance while armed with a firearm in violation of Health and Safety Code section 11370.1, subdivision (a).[1]

Defendant now contends (1) the initial contact with the officers was not a consensual encounter, (2) the officers did not have reasonable suspicion to detain her, and (3) the search of the Accord was unlawful. Finding no prejudicial error, we will affirm the judgment.

BACKGROUND

We derive the background from the hearing on defendant's motion to suppress evidence, which involved the testimony of Sacramento Police Officer Maxwell Anderson, a transcript of Officer Anderson's body camera video, and the portion of that video played at the hearing.

Officer Anderson was on patrol with his partner Officer Christopher Jensen in a police SUV in Sacramento County at about 4:04 p.m. Officer Anderson was in full uniform. He had been a sworn peace officer for about five years and frequently patrolled the area in which he was driving. That area was known for drug, firearm, and vehicle-theft crimes, and Officer Anderson considered it one of the most crime-ridden places in the city.

---

[1] Gallegos challenged the trial court's order denying his suppression motion. (*People v. Gallegos* (Sept. 13, 2022, C093509) [nonpub. opn.].) This Court affirmed the trial court's order, concluding the initial encounter between Gallegos and the officers was consensual, but even if it was a detention, the officers were justified in briefly detaining Gallegos as they verified his probation status based on reasonable suspicion that Gallegos was engaged in drug sales and the officers' advance knowledge that Gallegos was on searchable probation. (*Ibid*.) The California Supreme Court denied Gallegos's petition for review. (*People v. Gallegos* (Nov. 16, 2022, S276427).)

Officer Anderson saw three individuals congregated around the open, front-passenger-side door of a parked Honda Accord. The individuals were standing about three to four feet from the frame of the open car door. A vacant building occupied the block where the Accord was parked. Defendant sat in the front passenger seat of the Accord. The group standing by the car looked in Officer Anderson's direction and immediately walked away from the Accord. Officer Anderson recognized Gallegos as one of the individuals in the group.

Officer Anderson drove by that location almost daily, had seen Gallegos there multiple times a week, and had contacted Gallegos on three to four prior occasions in that area. He knew from prior contacts that Gallegos was on probation. In Officer Anderson's experience, it was unusual for Gallegos to gather with other people at that location and walk away upon seeing police officers. Officer Anderson had heard reports that drugs were found under candles at a vigil at that location and suspected that Gallegos was using the vigil as a cover for drug deals.

Officer Anderson got out of the police vehicle, saying "come here." Gallegos and two other males were walking away from where the Accord was parked. Officer Anderson did not use the loud speaker or sirens on the SUV. He did not draw his weapon. He contacted Gallegos because Gallegos, a probationer, walked away upon seeing the police SUV, conduct that Officer Anderson considered to be unusual and evasive.

Gallegos moved away from Officer Anderson even after the officer said, "guy in the red shirt." Gallegos was the only person wearing a red shirt. But Gallegos stopped when Officer Anderson said "hey" and confirmed that he was referring to Gallegos. Officer Anderson said, "we just want to talk with you over here."

Gallegos claimed he was not on probation or parole in response to Officer Anderson's question about whether he was on probation. Using a database, Officer

3

Jensen confirmed that Gallegos was on informal searchable probation. Officer Jensen put Gallegos in handcuffs and searched him after confirming his status.

Defendant got out of the Accord and shut the car door after Officer Anderson contacted Gallegos. She was standing by the Accord when Officer Anderson approached her. The officer asked defendant about ownership of the Accord and whether defendant knew Gallegos. Defendant replied that the Accord belonged to her and she knew Gallegos. Officer Anderson then asked defendant and another individual, "How about you guys hang out" on the sidewalk. Officer Anderson testified that because Gallegos, a probationer, and others reacted in an evasive manner to the police SUV and all of them were initially by the Accord, the officers sought to "freeze the situation" to make sure Gallegos had not discarded anything illegal and to "control the situation" involving multiple people until the officers verified Gallegos's probation status and assessed what was going on.

Officer Anderson had defendant and two others sit on the curb. He obtained their names and dates of birth. Defendant was not placed in handcuffs. When asked whether Gallegos drove the Accord sometimes, defendant responded in the negative. Officer Anderson then asked for permission to search the Accord and defendant said no, there was no reason to search the Accord and Gallegos was not in her car. In response to further questioning, defendant said Gallegos was her fiancé, he had his own car and she had hers. Defendant said she had been sitting on the passenger side of the Accord because she was cleaning the car. When Officer Anderson asked whether the officers would find anything illegal if they searched the Accord, defendant responded "You can't search my car." Officer Anderson testified that he detained defendant because Gallegos and others were standing around the Accord and walked away from the car; arrests for drug, firearm and vehicle-theft crimes had occurred in that area; Gallegos was seen in that area multiple times a week; Officer Anderson suspected that Gallegos was selling drugs there; and Gallegos was on probation.

4

When the officers conferred about searching the Accord, Officer Jensen informed Officer Anderson that Gallegos was driving the Accord when he was arrested in a dope sales case two months prior. But the officers did not search the Accord at that point. Instead, Officer Anderson asked defendant more questions. He asked where Gallegos's car was and defendant answered, "not here." After defendant refused to answer further questions about Gallegos, Officer Anderson asked Gallegos whether the Accord belonged to him and defendant. Gallegos said the Accord did not belong to him, it belonged to defendant. Gallegos said his car was a Chevy Impala parked about 30 yards from the Accord.

Officer Anderson searched the Impala based on Gallegos's probation status. He found a scale and two baggies in the center console. One of the baggies contained a marijuana leaf. The other baggie was tied in a knot. There was an empty sandwich-bag box and an opened box containing sandwich bags on the front passenger floorboard. Officer Anderson opined that the scale, sandwich bags and tied baggies were indicative of drug sales. A purse containing an ATM and a benefits card with defendant's name was in the glove compartment.

After he searched the Impala, Officer Anderson told defendant he was going to search the Accord. Defendant repeatedly protested and refused to unlock the car doors. Defendant was placed in handcuffs after warnings that she would be placed under arrest if she did not cooperate with the officers' investigation and her continued refusal to unlock the car doors. Upon searching the Accord, officers found a woman's wallet in the front passenger area where defendant had been seated; the wallet contained two baggies that were tied in a knot and appeared to contain methamphetamine. There was a pill bottle with Gallegos's name in the front passenger compartment. In the Accord officers also found a scale, a bag containing glass pipes typically used to smoke methamphetamine, two firearms, and men's clothing.

5

In her motion to suppress evidence, defendant argued the officers detained her when they asked her to sit on the curb, the detention was unlawful because there was no objectively reasonable suspicion that she was involved in criminal activity, Gallegos's probation condition did not justify a search of the Accord, and there was no probable cause to search the Accord. The People opposed defendant's motion, arguing the initial contact with defendant was a consensual encounter, the officers lawfully detained Gallegos and defendant, the officers lawfully searched the Impala based on Gallegos's probation condition, and there was probable cause to search the Accord.

The trial court made the following factual findings:

Officer Anderson recognized Gallegos, having seen him many times in the area within the prior year and making contact with him on three to four occasions. The officer saw Gallegos standing close to the open door of the Accord and walking away. Officer Anderson had never seen or known Gallegos to walk away from the police. Defendant was seated in the passenger seat of the Accord. The area was among the most crime-ridden in the city. Officer Anderson believed, based on his training, experience, and familiarity with the location, that a nearby vigil was used as a cover for drug activity. The officer had seen Gallegos at or near the vigil multiple times in the prior year. The officers stopped their vehicle near the Accord. They did not use a siren, loudspeaker, or lights. Officer Anderson called out to Gallegos, saying "hey, can you come talk to me" or words to that effect, seeking to have Gallegos return and talk to the officers. Gallegos made a false statement about not being on probation or parole. Officers handcuffed Gallegos after confirming his searchable probation status. The officers learned that Gallegos was driving the Accord when he was arrested for selling drugs two months earlier. A reasonable inference from the evidence was that the Accord belonged to Gallegos or Gallegos had control over the Accord. Gallegos identified an Impala parked 30 to 40 yards away as belonging to him. He had the keys for it. Defendant got out of the Accord and stood outside the vehicle after Officer Anderson made contact with

6

Gallegos. The officers had defendant and others sit on the curb after the initial contact with defendant. They asked her questions, which she answered. Defendant told the officers the Accord belonged to her, and that Gallegos was her current or soon to be fiancé. The officers did not use threatening or intimidating language, no weapons were drawn, only two officers were on scene, and they were in a public place in broad daylight. Indicia belonging to defendant was found in the glove box of the Impala. Items indicative of drug packaging for sales were also found in the Impala. At some point, the officers threatened to take defendant to jail. The officers believed defendant was obstructing their investigation. Defendant was eventually placed in handcuffs. The officers searched the Accord after they had searched the Impala. By that time, the officers had reasonably connected Gallegos to the Accord.

The trial court concluded that the initial contact between the officers and Gallegos was consensual, the officers were justified in detaining Gallegos after that, and the subsequent search of the Impala was justified under the probation search exception to the warrant requirement. As to defendant, the trial court ruled the initial contact between defendant and the officers was also consensual. If the officers detained defendant when they asked her to sit on the curb, it was at most a minimal investigative detention which was reasonable under the circumstances to freeze and assess the situation. But the nature of the contact changed after the search of the Impala and during the colloquy between defendant and the officers about searching the Accord. Nevertheless, the detention of defendant was reasonable under the circumstances. And the search of the Accord was justified based on Gallegos's probation status. The trial court denied defendant's motion to suppress evidence.

Defendant and Gallegos entered pleas of no contest to unlawful possession of methamphetamine and cocaine while armed with loaded, operable firearms in violation of Health and Safety Code section 11370.1, subdivision (a). The trial court dismissed the

7

remaining counts and placed defendant on formal probation for two years subject to various conditions, including serving 180 days in county jail.

Additional facts are set forth in the discussion as relevant to the contentions on appeal.

STANDARD OF REVIEW

A defendant may move to suppress evidence obtained as a result of an unreasonable search or seizure. (Pen. Code, § 1538.5, subd. (a)(1)(A).) Such a challenge is evaluated exclusively under federal constitutional standards. (*People v. Carter* (2005) 36 Cal.4th 1114, 1140-1141; *People v. Banks* (1993) 6 Cal.4th 926, 934.) The Fourth Amendment to the United States Constitution protects a person's right to be secure against unreasonable searches and seizures. (*Carter,* at p. 1140.) A warrantless search is presumptively unreasonable and the prosecution bears the burden of showing by a preponderance of the evidence that the search was justified under the Fourth Amendment. (*United States v. Matlock* (1974) 415 U.S. 164, 177, fn. 14; *People v. Simon* (2016) 1 Cal.5th 98, 120; *People v. James* (1977) 19 Cal.3d 99, 106, fn. 4.)

In reviewing a trial court's order denying a motion to suppress evidence, we defer to the trial court's express and implied findings of fact, where supported by substantial evidence. (*People v. Tully* (2012) 54 Cal.4th 952, 979; *People v. Leyba* (1981) 29 Cal.3d 591, 596-597 (*Leyba*).) " '[W]e view the evidence in a light most favorable to the order denying the motion to suppress' [citation], and '[a]ny conflicts in the evidence are resolved in favor of the superior court's ruling' [Citation]. Moreover, [we] 'must accept the trial court's resolution of disputed facts and its assessment of credibility.' " (*Tully*, at p. 979.) But we independently determine, based on the facts found, whether a seizure occurred and whether a search or seizure is proper under the Fourth Amendment. (*Ornelas v. United States* (1996) 517 U.S. 690, 691, 699 (*Ornelas*); *People v. Zamudio* (2008) 43 Cal.4th 327, 342 (*Zamudio*); *Leyba*, at p. 597.) We will affirm the trial court's ruling if it is correct on any theory of applicable law, even if for reasons different than

8

those given by the trial court. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 145 (*Letner and Tobin*); *People v. Evans* (2011) 200 Cal.App.4th 735, 742.)

DISCUSSION

I

Defendant contends the initial contact with the officers was not a consensual encounter.

A

Whether the contact between the officers and defendant was consensual or resulted in a detention is significant because a consensual encounter does not result in a seizure and, therefore, does not implicate the Fourth Amendment. (*Florida v. Bostick* (1991) 501 U.S. 429, 434 (*Florida*); *In re James D.* (1987) 43 Cal.3d 903, 911-912, 918.) An officer may initiate a consensual encounter without an objective justification for the contact. (*Florida,* at p. 434; *In re Manuel G.* (1997) 16 Cal.4th 805, 821; *In re James D.*, at pp. 911-912.) On the other hand, a detention is a seizure under the Fourth Amendment for which an objectively reasonable suspicion of criminal activity is required. (*United States v. Arvizu* (2002) 534 U.S. 266, 273 (*Arvizu*); *In re Manuel G.,* at p. 821; *In re James D.*, at p. 918.)

A seizure occurs when in view of all of the circumstances surrounding the incident, a reasonable person in the position of the person confronted would have understood that he or she was not "free to ignore the police presence and go about his [or her] business." (*Brendlin v. California* (2007) 551 U.S. 249, 261; see *id.* at pp. 254-255.) We assess whether a seizure has occurred under the totality of the circumstances, rather than looking at particular details in isolation. (*Florida, supra*, 501 U.S. at p. 439; *People v. Tacardon* (2022) 14 Cal.5th 235, 241; *In re Manuel G., supra*, 16 Cal.4th at p. 821.) Relevant circumstances might include the presence of several officers, an officer's display of a weapon, the use of a siren or lights, some physical touching of the person, the use of a patrol car to block movement, or the use of language or a tone of voice indicating

9

that compliance with the officer's request might be compelled. (*United States v. Mendenhall* (1980) 446 U.S. 544, 554-555; *Tacardon,* at pp. 241-242.) The test is objective; it looks at what the officer's words and actions would have conveyed to a reasonable person. (*Zamudio, supra*, 43 Cal.4th at p. 341; see *California v. Hodari D.* (1991) 499 U.S. 621, 628.)

B

Defendant claims Officer Anderson detained Gallegos by stopping the police SUV at a diagonal to the curb against traffic and ordering Gallegos to stop walking and to walk toward the officer. Certainly reasonable minds might differ on this point based on the record, and it is also arguable whether a detention of Gallegos is relevant to whether the officers detained defendant. (*People v. Llamas* (1991) 235 Cal.App.3d 441, 446 [the defendant could not assert the detention of another person]; see *United States v. Payner* (1980) 447 U.S. 727, 731 [no exclusion of evidence unless the search violated the defendant's own constitutional rights].) But even if we assume the question of whether Gallegos was detained is relevant to defendant, we must accept factual inferences in favor of the trial court's ruling. (*People v. Chamagua* (2019) 33 Cal.App.5th 925, 928; *People v. King* (1977) 72 Cal.App.3d 346, 349-350.) A reasonable inference from Officer Anderson's words is that the officer was attempting to get Gallegos's attention to speak with him. (*King,* at p. 350 [officer's calling out "Danny, stop, I want to talk to you" did not result in a detention].)

The portion of Officer Anderson's bodycam video admitted into evidence does not show that the officer used the police SUV to block Gallegos's path or the path of any car. The video, transcript and Officer Anderson's testimony support the trial court's factual findings with regard to the initial contact with Gallegos. The video shows that Officer Anderson said "come here" in a calm voice, and there was a group of four males on the grass/dirt area by a vigil. Officer Anderson had three to four prior contacts with Gallegos and recognized him. When Gallegos started to walk away even after Officer Anderson

10

said "come here" and "guy in the red," Officer Anderson tried to get Gallegos's attention again by calling, "hey" and "guy in the red shirt" and then saying, "we want to talk over here." It was about 4:04 p.m. There were several other people in the area. Officer Anderson approached Gallegos and the other males alone during the initial contact. He did not draw his gun or use the loudspeaker or siren on the police SUV. He did not rush at Gallegos. He did not touch Gallegos. His words and tone of voice at that point did not indicate that he would exercise his official authority to restrain Gallegos. We decline to say the trial court erred in concluding that the initial contact between Officer Anderson and Gallegos was not a detention.

C

Defendant further contends she was detained when Officer Anderson directed her to sit on the curb. But again, we must accept factual inferences in favor of the trial court's ruling, and a reasonable inference from the record is that defendant was not initially detained. Officer Anderson testified that defendant was standing by the Accord when he first contacted her. There is no evidence that Officer Anderson drew his weapon, approached defendant aggressively, issued any commands, searched defendant, restrained her, or indicated in any manner that she could not leave. Officer Anderson asked defendant about the ownership of the Accord and whether she knew Gallegos, and defendant answered his questions. Officer Anderson then asked defendant and another individual, "How about you guys hang out" on the sidewalk. The statement did not order defendant to remain on the sidewalk or direct that defendant was not free to leave.

Contrary to defendant's argument, *People v. Jones* (1991) 228 Cal.App.3d 519 is not on point. Unlike in *Jones*, here there is no evidence Officer Anderson parked the police SUV in a manner to obstruct defendant or her car. (*Id.* at pp. 522-523.) The officer in *Jones* directed the defendant to stop and grabbed the defendant's forearm. (*Id.* at p. 522.) Officer Anderson did not grab Gallegos. He did not direct defendant to stop or grab her when he initially contacted her.

11

It is true that at some point Officer Anderson had defendant and two others sit on the curb, obtained their names and dates of birth, and asked them questions. But an officer's asking a person to sit on the curb, by itself, does not necessarily create a detention. (Cf. *In re J.G.* (2014) 228 Cal.App.4th 402, 412-413 [a detention resulted where the officer conveyed to the minor that he suspected him of unlawful activity and searched him, additional officers and patrol cars arrived on scene, a weapon was displayed, and the officer asked the minor to sit on the curb].) An officer's request to conduct a search also does not, without more, result in a detention. (*People v. Coulombe* (2000) 86 Cal.App.4th 52, 57, fn. 3; *People v. Franklin* (1987) 192 Cal.App.3d 935, 941.)

However, even if Officer Anderson detained defendant when he asked her to sit on the curb and questioned her, for reasons we will explain, any such detention was supported by reasonable suspicion.

II

Defendant contends the officers did not have reasonable suspicion to detain her.

A brief detention for the purpose of investigating possible criminal activity is lawful under the Fourth Amendment when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide an objective basis for suspecting that the person detained may be involved in criminal activity. (*Arvizu, supra*, 534 U.S. at p. 273; *Scott v. United States* (1978) 436 U.S. 128, 137; *People v. Souza* (1994) 9 Cal.4th 224, 230-231, 237-238 (*Souza*).) Relevant circumstances include the officer's objective observations, information known or made known to the officer, evasive conduct by the defendant or others, an area's reputation for criminal activity, and inferences a trained officer could draw from the circumstances. (*Souza*, at pp. 237, 239-240.) An officer may draw on his or her training and experience to make inferences from and deductions about the cumulative information available. (*Arvizu*, at pp. 273, 276; *Letner and Tobin, supra*, 50 Cal.4th at pp. 145-146.) Although a mere hunch is insufficient to justify a temporary detention, reasonable suspicion is a less

12

demanding standard than probable cause and preponderance of the evidence. (*Kansas v. Glover* (2020) __ U.S. __ [140 S.Ct. 1183, 1187]; *Arvizu*, at p. 274.)

Officer Anderson saw three individuals congregated around the open door of a car parked in an area known for drug, firearm, and vehicle-theft crimes. The car was parked in front of a vacant building. There was no open business on that side of the street. Officer Anderson knew of reports that drugs were previously found under candles at a nearby vigil. The officer had seen Gallegos in that area multiple times a week and suspected that Gallegos was using the vigil as a cover for criminal activity. Presence in an area where criminal offenses are known to occur is a relevant fact to consider, among others, in determining whether a stop is supported by reasonable suspicion. (*Illinois v. Wardlow* (2000) 528 U.S. 119, 124; *Souza, supra*, 9 Cal.4th at p. 240.) The individuals standing by the Accord looked in Officer Anderson's direction and immediately walked away from the car. In Officer Anderson's experience, it was unusual for Gallegos to gather with other people at that location and to walk away upon seeing the police. Gallegos moved away from Officer Anderson even after the officer called out "come here" and "guy in the red shirt." Officer Anderson knew from prior contacts that Gallegos was on probation, but Gallegos made a false statement about his probation status. Officer Anderson considered Gallegos's conduct to be evasive. Evasive behavior is another pertinent factor that can be considered in making a reasonable suspicion determination. (*Illinois,* at p. 124; *Souza,* at pp. 235, 240.) Defendant was sitting in the Accord when Gallegos and others were standing around the car, but she got out of the car and shut the car door when Officer Anderson contacted Gallegos. Defendant was standing outside the Accord when Officer Anderson approached her. She acknowledged she knew Gallegos.

In *Rodriguez*, a case defendant asserts is controlling, the defendant and his companions were talking and socializing in front of an apartment complex within the turf of a particular gang, wearing clothing consistent with membership in that gang. (*People*

13

*v. Rodriguez* (1993) 21 Cal.App.4th 232, 237-238.) Officers approached the group to obtain field identification information and to photograph them for use in future criminal investigations. (*Id.* at pp. 238-239, 241.) The officers did not see the group do anything suspicious. (*Id.* at p. 239.)

In contrast, here, considered together, all of the above circumstances, evaluated in light of Officer Anderson's training and experience and his knowledge about drug-related crimes at that location, would cause a reasonable police officer in like position to suspect that defendant might be involved in criminal activity. The possibility of an innocent explanation for walking away from the Accord upon the appearance of the police SUV and for people gathering around a car in a location known for drug-related crimes does not preclude the officers from forming a reasonable suspicion of criminal conduct. (*Arvizu, supra*, 534 U.S. at p. 277-278; *Letner and Tobin, supra*, 50 Cal.4th at pp. 146-147; *In re Raymond C.* (2008) 45 Cal.4th 303, 308 [stating that an officer is not "required to eliminate all innocent explanations that might account for the facts supporting a particularized suspicion."] " 'Indeed, the principal function of [police] investigation is to resolve . . . ambiguity and establish whether the activity is in fact legal or illegal . . . .' " (*Leyba, supra*, 29 Cal.3d at p. 599.) Although defendant seeks to separately challenge each of the reasons Officer Anderson offered for detaining defendant, the reasonableness of a temporary detention depends on the totality of the circumstances and not on any one circumstance viewed in isolation. (*Arvizu,* at p. 274; *United States v. Sokolow* (1989) 490 U.S. 1, 9; *Souza, supra*, 9 Cal.4th at p. 227.) The trial court did not err in ruling that if the officers detained defendant by having her sit on the curb and asking her questions, it was at most a brief investigatory detention which was reasonable under the circumstances.

## III

Defendant further contends the search of the Accord was unlawful.

A warrantless search of a car is lawful where supported by probable cause. (*Chambers v. Maroney* (1970) 399 U.S. 42, 47-48; *People v. Thompson* (2010) 49 Cal.4th 79, 112.) Probable cause to search exists where the known facts and circumstances, viewed from the standpoint of an objectively reasonable officer, are sufficient to warrant a belief in a reasonably prudent person that contraband or evidence of a crime will be found. (*Ornelas, supra*, 517 U.S. at p. 696; *Chambers*, at pp. 47-48.) An officer may draw inferences based on his own experience in deciding whether probable cause exists. (*Ornelas,* at p. 700.) And probable cause may be based on information the officer conducting the search obtained from another officer. (*Thompson*, at p. 112.) If probable cause justifies the search of a car, the officer may search every part of the car. (*United States v. Ross* (1982) 456 U.S. 798, 800, 825.) As with reasonable suspicion, we examine the totality of the circumstances rather than isolated facts in determining whether there was probable cause to search. (*People v. Moore* (2021) 64 Cal.App.5th 291, 298.)

In addition to the facts, discussed above, supporting a reasonable suspicion to detain defendant, defendant made a false statement to Officer Anderson about whether Gallegos ever drove the Accord. Officer Anderson learned prior to the search of the Accord that Gallegos had been driving the Accord two months prior when he was arrested for a drug sales. Defendant also made a false statement when she told Officer Anderson that Gallegos's car was not nearby. And Gallegos made a false statement when, just prior to the search of the Accord, he denied that he had been standing by the Accord when the officers initially saw him. False or misleading statements may evidence a consciousness of guilt and are a relevant factor in assessing probable cause. (*People v. Carillo* (1995) 37 Cal.App.4th 1662, 1669-1671; see *District of Columbia v. Wesby* (2018) _ U.S. _ [199 L.Ed.2d 453, 465].)

In addition, as the trial court found, it was reasonable for the officers to connect Gallegos and defendant to the Impala and Accord. Gallegos's prior drug sales arrest

connected him to the Accord. Defendant was sitting in the passenger seat of the Accord and Gallegos was standing near it when the officers first observed them. Defendant's ATM and benefits cards were found in the Impala. The Impala was parked about 30 yards from the Accord. Moreover, Officer Anderson found items that in his experience were indicative of drug sales in the Impala. Although none of those circumstances, individually, might have justified a warrantless search of the Accord, all of the circumstances taken together, viewed from the standpoint of an objectively reasonable police officer, provided probable cause to search the Accord.

Because the search of the Accord was proper based on probable cause, we need not consider defendant's alternate claim that it was unlawful to search the car based on Gallegos's probation status.

### DISPOSITION

The judgment is affirmed.

/S/
MAURO, J.

We concur:


/S/
EARL, P. J.


/S/
KRAUSE, J.